**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**CRETOR CONSTRUCTION**
**EQUIPMENT LLC,**

|  |  |
|---|---|
| **Plaintiff,** | **Case No. 1:24-cv-322** |
| **v.** | **JUDGE DOUGLAS R. COLE** |

**CHRISTOPHER SCOTT GIBSON,**

    **Defendant.**

## OPINION AND ORDER

During his employment at Plaintiff Cretor Construction Equipment, LLC, (Cretor), Defendant Christopher Scott Gibson signed a contract containing a comprehensive noncompetition provision. Cretor now claims that Gibson breached that agreement by accepting a position with a competitor. So it seeks a preliminary injunction. For his part, Gibson admits that he knew he signed the noncompete. And the Court's review of the agreement shows that (1) the terms of the noncompete are clearly stated and easily understandable and (2) Cretor provided Gibson consideration in exchange for agreeing to those terms. Moreover, the evidence the parties presented at the preliminary injunction hearing suggests that the temporal and geographic limitations (at least as Cretor proposes to enforce them—more on that below) are reasonable.

For most contractual provisions, that would be the end of the story. But noncompetes are different. Ohio law, which all agree applies here, generally disfavors restrictive covenants because of concerns about interfering with normal competition

and thereby harming non-parties (i.e., consumers). It is the employer's burden to prove the need for enforcement, principally by reference to a non-exhaustive set of nine factors that Ohio courts refer to as the *Raimonde* factors—named for *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975), the case in which the Ohio Supreme Court first announced them. Taken together, those factors seek to distinguish noncompetition provisions that have pro-competitive effects (such as allowing employers to invest in employee training without fear that the employee will then use those new skills for a competitor) from those that merely thwart competition (by interfering with competitors' efforts to hire new workers).

Here, based on the evidence presented so far, the Court concludes that Cretor has not met its heavy burden of clearly showing that the noncompetition provision Gibson signed falls in the former camp, rather than the latter. More specifically, Cretor has not shown that it provided Gibson—who had both decades of experience in concrete pumping and a dedicated customer base before joining Cretor—any new skills or training, gave him access to either confidential information or any meaningful number of concrete-pumping customers with whom he did not have preexisting relationships, or otherwise invested in him or meaningfully burdened itself in any way in reliance on the noncompete during the roughly two and a half years he worked there, such that Gibson would be unfairly competing merely by working for a competitor. Accordingly, the Court **DENIES** Cretor's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 4) as follows: (1) as

moot to the extent that the Motion seeks a temporary restraining order;[1] and (2) on the merits to the extent that the Motion seeks a preliminary injunction.

## BACKGROUND[2]

### A.    Gibson's Employment

Gibson has worked in the concrete-pumping industry since 1998, when he dropped out of high school during his senior year and began working at Premier Concrete Pumping (Premier). When Reynolds Concrete Pumping (Reynolds) bought Premier in the early 2000s, Gibson remained with the company. But, in 2021, another company, Concrete Pump Partners (Pump Partners)—a company for which Gibson did not wish to work—acquired Reynolds. So when Gibson learned of the impending sale, he started investigating his options. As a result, he joined Cretor in early October 2021 (though the exact date is unclear), (Compl., Doc. 3, #65), immediately after Pump Partners closed on its purchase of Reynolds.

The testimony at the hearing established that "concrete pumping" refers to a process in which concrete is brought to a job site, then placed into a hopper that feeds into a pump. The pump forces the concrete through a long hose or tube into a specific

---

[1] The Hamilton County Court of Common Pleas entered a temporary restraining order prior to the removal of this cause to this Court, which order this Court continued upon agreement of the parties until 11:59 p.m. on June 28, 2024. (6/17/24 Not. Order). As that meant Cretor's request for a temporary restraining order had already resolved, (Doc. 4, #88), that portion of its motion does not require resolution by the Court in this Opinion and Order.

[2] The record currently before the Court consists of the Complaint (Doc. 3), the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 4), and the exhibits that the parties introduced into evidence during the preliminary injunction hearing. Given the available timeframe, the Court had no access to a final transcript of the preliminary injunction hearing. Accordingly, references to the parties' statements during the hearing do not contain record cites.

location. In this way, concrete can be distributed to precisely where it is needed at a job site without disturbing other parts of the job site. For example, you could run the hose through a finished building to pour a new floor on the third floor of that building. Testimony also suggested that making the process work seamlessly at a given job site is not always an easy or straightforward task. Someone must operate the boom that moves the hose to a particular location, and entry and access to that location can be tight, such that operating the boom is tricky. Similarly, powerlines or other obstacles may present impediments. The evidence further suggested that over the course of his twenty-plus years at Premier/Reynolds, Gibson had developed the skills and experience necessary to undertake difficult pumping jobs, and that he had developed a good reputation with many of the builders, general contractors, and concrete subcontractors in the Nashville area who drive demand for concrete-pumping services.

When Cretor hired Gibson in 2021, it gave him the title "Sales Manager." But the evidence at the hearing suggested he was not a salesperson per se. Rather, his responsibilities at Cretor included managing customer relationships (in the broad sense of making sure jobs went well), providing customers quotes for new work, and generally addressing issues that arose at Cretor job sites. Consistent with that, Gibson testified that a job title referencing "technical situations" would have conveyed his responsibilities more accurately than a job title referencing "sales."

But one thing on which the parties agree is that, as suggested above, Gibson brought well-established customer relationships with him to Cretor. Indeed,

according to Cretor's President Glen Grabowski,[3] those preexisting relationships were precisely what made Gibson attractive to Cretor. That is, Cretor hired him specifically *because* Cretor thought Gibson's existing customers would continue to use him at Cretor. So, for example, the parties agree that Gibson had longstanding preexisting relationships with R.G. Anderson, Joe Salyers, Lithko, and Meritage Homes—customers for whom he continued to provide concrete-pumping services at Cretor. And while Gibson acknowledged that he met "a few" new customers while working at Cretor, Cretor put forward no evidence suggesting that the work from these customers made up any significant portion of the work Gibson did while there. Nor did it put forward any evidence about the role that Gibson's employment at Cretor played (if any) in his meeting those new customers (as opposed to, for example, those new customers arising solely as a result of referrals from his pre-existing customers).

To prevent employees from leaving to engage in activities that could cause Cretor competitive harm, Cretor requires staff who it considers as having access to confidential information and/or who perform customer-facing roles to sign a "Long Term Incentive Bonus Plan" (LTI) Agreement. Shortly after hiring Gibson (Glen did not remember exactly when, though he thought it was within a few days after Gibson joined Cretor), Glen called Gibson into his office, presented him with the LTI Agreement, and asked him to sign it. (Pl's Ex. A). After flipping through the document, Gibson did so. (*Id.*). That LTI Agreement is what contains the provisions

---

[3] The Court refers to both Glen Grabowski and his son, Scott Grabowski, in this Opinion. To avoid confusion, it refers to those two individuals by their first names.

of interest here: a broad noncompete covenant, along with covenants prohibiting disclosing confidential information, interfering with Cretor's business relationships, and soliciting Cretor employees. (*Id.* ¶¶ 4.2.1–.6). For his part, Gibson testified that, although he only read the LTI Agreement briefly before signing, he knew it contained a noncompete covenant.

The main purpose of the LTI Agreement, or so it says, is to enhance retention of senior employees by providing them a yearly bonus. (*Id.* ¶ 1.1.1 ("The purpose of this Agreement is to aid in the long-term retention of Employee as an employee of the Company … by providing Employee the opportunity to earn bonus compensation …")). The LTI Agreement does not specify a bonus amount. Rather, it says that each annual bonus will be set at the President's discretion, based on one objective component (performance against EBITDA) and one subjective component (the President's assessment of Gibson's efforts to achieve the goals set forth on Exhibit B to the Agreement—an exhibit that oddly, at least in Gibson's case, consisted of a blank page). (*Id.* ¶ 3.1). In any event, based on testimony at the hearing, Cretor appears to have paid Gibson roughly $2,000 or $3,000 as an annual bonus under the Agreement on top of a base salary of roughly $138,000.

During the approximately two and a half years Gibson worked at Cretor's Nashville branch office, four other Cretor employees worked in that office: Glen; his son, Scott Grabowski, who was the branch manager; and two other administrative employees. Gibson originally reported to Glen. But at a certain point their

relationship began to sour. As a result, Cretor shifted Gibson to reporting to Doug Rhiel instead.

## B.    Gibson's Departure from Cretor

On Friday, May 24, 2024, Gibson announced he was resigning his position at Cretor. (Doc. 3, #65; Pl.'s Ex. D; Def.'s Ex. 5). He started working for Southeast Ram Concrete Pumping (Ram) on Monday, May 27, 2024. Ram is a subsidiary of Ram. Co., a concrete finishing company doing business in Oklahoma. The parent company, Ram Co., created Ram to break into the Middle Tennessee concrete-pumping market.

While all agree that the Verified Complaint (Doc. 3) correctly alleges that Gibson left on May 24, 2024, the Complaint also contains several allegations about the *manner* of Gibson's resignation that Cretor walked back at the preliminary injunction hearing. First, Cretor alleged that Gibson wiped his company phone and computer on the way out the door. (*Id.* ¶ 22, #68). But the allegation that Gibson wiped his company phone was based merely on Glen's finding less data than expected on the phone, although he admits it still had some customer contact information. And the allegation that Gibson wiped his computer was similarly based on Glen's finding no data on the computer after Gibson returned it to Cretor. As to the latter, Gibson testified that he never used the computer while working for Cretor—a rather benign and non-sinister explanation for why there was no data on it. Nor did Gibson agree he had wiped his phone. Meanwhile, Glen testified that he is not an information technology (IT) expert, has no personal knowledge that Gibson wiped either device,

7

and does not have any IT forensic examination information suggesting that Gibson did so.

Second, the Verified Complaint alleges that Gibson improperly transferred his Cretor phone number to a personal device before he left, thereby implying that he did so to continue receiving calls from his Cretor customers while at his new employer. But Gibson testified that he transferred the number to his personal device while employed at Cretor because his company-issued device was having problems (of which Glen was aware). And Glen acknowledged that shortly after Gibson left, Cretor rolled back the number to one of its own devices, so that customers calling Gibson's old Cretor number now reach Cretor, not Gibson.

Finally, Cretor alleged that Gibson "has necessarily disclosed confidential Cretor information" since he started working for Ram. (Doc. 3 ¶ 24, #69). At the hearing, Glen suggested that the confidential information consisted of customer identities, upcoming jobs, and pricing information. But Gibson testified (credibly, in the Court's view), that the customer identities for concrete-pumping services in Nashville are well known, and that pricing information consists largely of a per-cubic-yard price for concrete and an hourly rate for pumping services, both of which competitors (and their customers) freely share in the local industry. Beyond that, Cretor could not identify any allegedly confidential information to which Gibson may have had access at Cretor.

In terms of how the market for concrete-pumping jobs works in Nashville, Gibson testified that some customers are price-sensitive. But concrete pumping is

8

largely a "relationship business," meaning that builders and contractors want to work with concrete pumpers with whom they have had good experiences in the past. As noted above, the parties agreed that, in that regard, Gibson had a good reputation in the Nashville market. As Cretor's counsel characterized it, Gibson is somewhat of a Pied Piper whose concrete-pumping customers follow along with him.

On June 3, 2024, within a week of Gibson joining Ram, Cretor sued Gibson in the Hamilton County Court of Common Pleas. (Doc. 1-1, #7). It simultaneously sought a temporary restraining order (TRO) and preliminary injunction in that court. (*Id.* at #33–50). The state court granted the TRO the next day. (*Id.* at #51–52).

Gibson then removed the case to this Court. (Doc. 1). After holding a telephone conference with the parties regarding the pending motion for preliminary injunction, (6/17/24 Min. Entry), the Court extended the Hamilton County Court of Common Pleas' TRO until 11:59 p.m. on June 28, 2024, (6/17/24 Not. Order). And it held a hearing on Cretor's Motion for Preliminary Injunction on June 25, 2024. (6/25/24 Min. Entry). Gibson did not file an opposition to the motion. Instead, he relied on the evidence tendered at the hearing. Since the hearing, the parties have supplied a few more case citations by email to allow the Court to locate cases they referenced at the hearing. Beyond that, though, no party has filed any post-hearing briefing or requested the opportunity to do so. Thus as things currently stand (1) the TRO has expired, and (2) Cretor's request for a preliminary injunction is ripe for review.

## LEGAL STANDARD

"The party seeking the preliminary injunction bears the burden of justifying such relief." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). Courts assess such requests in light of four well-known factors: "(1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *Id.* "These factors … are to be balanced against each other." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). But "they do not carry equal weight." *Memphis A. Phillip Randolph Inst. v. Hargett*, 478 F. Supp. 3d 699, 703 (M.D. Tenn. 2020). Failing to prove at least some likelihood of success is usually fatal to obtaining injunctive relief, *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000), while failure to show an irreparable injury is always fatal, *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("A district court abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury." (cleaned up)).

As relevant here, a movant shows irreparable injury by identifying a "harm [to him] … [that] is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578. "And to merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *Memphis A. Phillip Randolph Inst.*, 478 F. Supp. 3d at 703–04.

Whenever material facts relevant to the preliminary injunction are in dispute, a district court must hold an evidentiary hearing. *Certified Restoration Dry Cleaning*

10

*Network, LLC v. Tenke Corp.*, 511 F.3d 535, 552–53 (6th Cir. 2007). At such a hearing, the Court may make credibility determinations, *id.* at 553; *Curtis v. Story*, 863 F.2d 47, 1988 WL 125361, at *1 (6th Cir. 1988) (table), and preliminary factual findings, *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997). While the movant need not proffer "irrefutable proof" or "prove his case in full at a preliminary injunction hearing" to merit his requested relief, *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 (6th Cir. 1985) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), the movant still must furnish sufficient evidence to make "a clear showing" that the balance of factors favors the issuance of a preliminary injunction. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis omitted). This is because a preliminary injunction is an "extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up).

## LAW AND ANALYSIS

The Court considers each of the preliminary injunction factors in turn, beginning with whether Cretor has shown a substantial likelihood of success on the merits. As discussed below, the second factor (irreparable harm) favors Cretor. But the other three factors favor Gibson. And weighing the various factors, the Court concludes that Cretor has not shown that the situation here falls within the "limited circumstances which clearly demand" a preliminary injunction. *Id.*

### A.    Likelihood of Success on the Merits

The LTI Agreement states that it will be governed by Ohio law, so the Court will apply that law here.[4] (Pl.'s Ex. A ¶ 6.1). Ohio law "does not favor restrictive covenants." *Ohio Urology, Inc. v. Poll*, 594 N.E.3d 1027, 1031 (Ohio Ct. App. 1991). To that end, "only reasonable noncompetition agreements are enforceable." *Lake Land Emp't Grp. of Akron, LLC v. Columber*, 804 N.E.2d 27, 33 (Ohio 2004). To be reasonable, a covenant must (1) be "no greater than is required for the protection of the employer"; (2) "not impose undue hardship on the employee"; and (3) not be "injurious to the public." *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (quoting *Raimonde*, 325 N.E.2d at 547). And Cretor must establish each factor by "clear and convincing evidence." *Id.* (quoting *Levine v. Beckman*, 548 N.E.2d 267, 270 (Ohio Ct. App. 1988)); *see also Century Bus. Servs., Inc. v. Barton*, 967 N.E.2d 782, 795 (Ohio Ct. App. 2011).

The Ohio Supreme Court has further identified nine factors on which courts can rely to inform their assessments of those three elements. *Raimonde*, 325 N.E. 2d at 547. Those are: (1) the geographical and temporal limitations of the covenant, (2) whether Gibson was "the sole contact with the customer," (3) Gibson's access to confidential information or trade secrets, (4) "whether the covenant seeks to eliminate competition which would be unfair to [Cretor] … or merely seeks to

---

[4] Although the parties do not engage in a conflict-of-law analysis, Ohio conflict-of-law rules give contractual choice-of-law provisions, like the one here, (Pl.'s Ex. A ¶ 6.1), presumptive enforceability. *Revel Sys., Inc. v. Frisch's Rests., Inc.*, No. 1:23-cv-507, 2024 WL 1406107, at *2 n.2 (S.D. Ohio Apr. 2, 2024). So the Court will use Ohio law here, with the caveat that this "determination is subject to revision were a party to challenge the validity of the agreement's choice-of-law provision." *Id.*

eliminate ordinary competition," (5) whether the covenant stifles Gibson's inherent skill and experience, (6) whether the benefit to Cretor is disproportional to the harm to Gibson, (7) "whether the covenant operates as a bar to [Gibson's] … sole means of support," (8) whether Gibson's skills were developed while he worked at Cretor, and (9) "whether the forbidden employment is merely incidental to the main employment." *Id.* (citation omitted). Here, as described below, the first, second, and ninth factors favor Cretor, but the other factors all favor Gibson.

Start with the first factor: geographic or temporal limitations on the noncompete covenant. The covenant proscribes various activities—competing with Cretor, working for another person or entity that competes with Cretor, discussing the possibility of such employment, or "render[ing], perform[ing], or provid[ing] any services related to" Cretor's area of business for Cretor's clients with whom Gibson had contact as a Cretor employee—within 100 miles of any Cretor office for one year after the end of Gibson's employment with Cretor. (Pl.'s Ex. A ¶ 4.2.3(a)). And it states that it does not apply if Cretor terminates Gibson without cause. (*Id.*). Moreover, at the hearing, Cretor made clear that it was not seeking enforcement even to the full geographic scope the agreement contemplates. Rather, it is seeking to enforce the noncompete provision only as to Gibson's activities within 100 miles of Cretor's Nashville or suburban Louisville offices. So Cretor seeks enforcement only for one year, and only in a 100-mile radius around two offices—offices in which it is undisputed that Gibson worked.

As a general matter, so long as the geographic scope corresponds to the geographic reach of the markets the person served while employed at the former employer, as the proposed enforcement does here, that supports enforceability. And a one-year term falls well within the range of time periods that Ohio courts have found reasonable. *E.g.*, *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 276 (Ohio Ct. App. 2000) (upholding a three-year global noncompete agreement); *Myers Servs., Inc. v. Costello,* No. CA-917, 1989 WL 76464, at *12 (Ohio Ct. App. June 26, 1989) (finding a noncompete agreement that forbade competing with the defendant's former employer in northern and north central Ohio for two years reasonable); *Total Quality Logistics, LLC v. Leonard*, 220 N.E.3d 225, 232–33 (Ohio Ct. App. 2023) (upholding a noncompete agreement that prohibited the defendant from working for any TQL competitor or soliciting TQL customers for one-year). Consistent with such cases, the Court finds the geographic and temporal limitations at issue in this case, as Cretor seeks to enforce them, reasonable. So the first factor favors Cretor.

So does the second factor: whether Gibson was a point of contact for customers. The Court heard extensive testimony about how much the concrete-pumping business relies on reputation, and how Gibson was a key customer contact during his time at Cretor. Gibson's only pushback on this point was that the concrete-pumping industry is one in which customers often work with different suppliers on different jobs, rather than an industry in which a given client typically works with a single concrete-pumping provider company. But that does not really go to whether Gibson was customer-facing. So the Court concludes that the second factor also favors Cretor.

14

The same is true of the ninth factor. This factor basically asks whether the activities that violate the covenant are a central portion of the former employee's new job. For example, assume the prohibited activity is engaging in competing sales of automotive parts. If the employee's new job is working in an automotive service bay, where from time to time he may suggest a customer purchase a new muffler, but the vast majority of his time does not involve sales or customer contact, the sales activities would be "incidental" to the new job for the purposes of this factor. But here, the evidence showed that Gibson's new job is for all intents and purposes identical to his old job. And the Court heard testimony that customer interface in securing and performing concrete-pumping jobs, a covered activity, is central to both. Thus this factor also favors Cretor. *Legacy Roofing Servs. LLC v. Fusco*, No. 1:23-cv-1341, 2024 WL 78279, at *12 (N.D. Ohio Jan. 8, 2024) ("Here, the work that Fusco does for Facility Products is very similar to the work that he did for Legacy Roofing. Because Fusco sells commercial roofing services in both jobs, this factor weighs in favor of enforcing the non-solicitation clause.").

That's it, though. The remaining factors all favor Gibson. Start with the third factor—access to confidential information. The only allegedly "confidential information" to which Cretor claims Gibson had access was pricing information, customer contact information, and jobs Cretor was considering. But as to pricing, the Court also heard testimony, which it found credible, that pricing information is generally public in the concrete-pumping industry. According to Gibson, prospective customers will often share a quote they received from one provider with another

provider. Indeed, he said it was not unusual for employees of concrete-pumping providers to share their pricing information directly with competitors' employees. And Gibson testified that the price for a given job is almost always based on the volume of concrete pumped (priced in dollars per cubic yard of concrete to be pumped), coupled with an hourly rate for how long the concrete-pumping provider is on-site. He also noted that both of those prices (dollars per cubic yard of concrete and the hourly rate for on-site pumping services) were largely standard in the market, subject to only small deviations. The only job-specific pricing anyone identified was Gibson's acknowledgement that there sometimes would be what he characterized as a "setup fee" for a particularly difficult job, typically in the range of a few hundred dollars.

Assuming that to be the case, none of this strikes the Court as a secret pricing formula that provides Cretor with a competitive advantage, or that would work a competitive harm if it fell into someone else's hands. Indeed, to hear Gibson tell it, pricing at Cretor worked exactly like pricing had worked during his two decades at Premier/Reynolds (subject to increased material and labor costs, of course). As further evidence of that, Gibson testified that he renewed on identical terms various quotes that he had open to Reynolds customers when he joined Cretor. Accordingly, any pricing information Gibson has is not protectable confidential information Gibson could use to engage in unfair competition against Cretor. *Arvco Container Corp. v. Weyerhaeuser Co.*, No. 1:08-cv-548, 2009 WL 311125, at *7 (W.D. Mich. Feb. 9, 2009) ("A court cannot presume, in the absence of proof, that a particular company's prices are confidential. Although price information can be proprietary, it may not be

confidential in the least, depending on the circumstances."); *U.S. ex rel. Daugherty v. Bostwick Lab'ys*, No. 1:08-cv-354, 2013 WL 3270355, at *21 (S.D. Ohio June 26, 2013) ("Such documents are not in fact confidential, in that they are provided to third parties and are routinely shared by those third parties with competitors.").

Customer contact information and the jobs that Cretor was pursuing do not help Cretor here, either. The problem with treating those as confidential is that Gibson largely *already had* the former when he arrived at Cretor. The evidence showed that Gibson had been working with almost all the customers he serviced at Cretor long before he arrived there. True, Gibson forthrightly acknowledged that he met "a few" new customers while at Cretor. But Cretor did not elicit any testimony even about who those new customers were and, perhaps more relevant to the confidential-information inquiry, that it would have been difficult in any way to find their contact information. And of course, as to those customers with whom he had pre-existing relationships, he must have had their relevant contact information. Likewise Cretor did not offer evidence that it uses secret or proprietary methods of customer solicitation that would harm Cretor if they fell into a competitor's hands. *Convergys Corp. v. Wellman*, No. 1:07-cv-509, 2007 WL 4248202, at *7 (S.D. Ohio Nov. 30, 2007) ("The Court, however, is not firmly convinced that all or any of the programs about which [Plaintiff] is concerned constitute confidential information or trade secrets and, to the extent they are, that they have much value for [Defendant's new employer]."). Accordingly, the Court fails to find a protectable interest relating to customer identities.

As for prospective concrete-pumping jobs, the evidence suggested that companies learned about jobs in one of two ways. Either customers called looking for concrete-pumping services—which here runs into the problems already identified above as to customer contact information—or employees might learn of such jobs through trade publications. Again, none of that strikes the Court as particularly "confidential." And, when the Court inquired whether Cretor had any trade secret methods or special techniques for pumping concrete, or any otherwise confidential information about how to provide concrete-pumping services, Glen acknowledged Cretor did not. So the third factor goes in Gibson's favor.

Both the fifth (stifling Gibson's inherent skills) and eighth *Raimonde* factors (Gibson's professional development during his stint with Cretor) also favor Gibson. These factors require the Court to assess whether the employee obtained some skill, or training, or access to customers, on a former employer's dime, such that it would be unfair to allow the employee to exploit those new skills, training, or customers, to the benefit of a new employer who had not paid those resource-acquisition costs. *Arthur J. Gallagher & Co. v. Anthony*, No. 16-cv-284, 2016 WL 4523104, at *11 (N.D. Ohio Aug. 30, 2016) ("Gallagher shows little protectable interest[] in Anthony's business relationships. Anthony did not start his insurance broker career with Gallagher. Gallagher gave Anthony no real training, did not introduce Anthony to preexisting Gallagher customers, and provided minimal direction. Instead, Anthony came to Gallagher with a book of business that benefitted little from the Gallagher relationship."); *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 529–30 (6th

Cir. 2017) ("The district court failed to distinguish between those clients Thompson recruited with the benefit of Hylant's and USI's resources and those he recruited solely on his own accord. Edgewood has no likelihood of success on the merits as to the latter camp."). Here, though, the Court heard extensive testimony outlining how Gibson had developed his skills and experience from over 20 years in the concrete-pumping business *before* joining Cretor, where he spent only roughly two and a half years. It is not at all clear to the Court that Gibson would have strengthened his skills and customer relationships simply by working at Cretor for that short stint. And more to the point, Cretor offered no evidence that Gibson had strengthened his skills or deepened his in-some-instances-decades-long customer relationships simply by working at Cretor for that time (beyond eliciting a conclusory response from Gibson that he had continued to "develop" his customer relationships while there). Nor did it point to any training or new skills that Cretor provided. At most, it elicited testimony that Gibson had met a few new customers while there. But even then, it did not provide any evidence about how much business those customers provided, or even who they were. And more importantly, Cretor did not present any evidence about the role Gibson's employment at Cretor played in helping him develop those relationships. Indeed, so far as we know on this record, the new customers were all referrals from his already-existing customers. Such testimony is too thin a reed to support enforcement of a broad noncompetition provision like the one here.

In an email after the hearing, Cretor directed the Court to the Eighth Circuit's decision in *Emerson Electric Co. v. Rogers*, as support for its argument that even an

employee's pre-existing customer relationships (i.e., those that the employee already had when he joined the former employer) can support enforcement of noncompete provisions when the employee leaves. 418 F.3d 841 (8th Cir. 2005). But on review, that case in fact highlights the opposite, at least on the facts here. True, in *Emerson*, the court pointed to customers that the former employee had brought with him to the former employer as one basis supporting enforcement of a noncompete. *Id.* at 845. But there the employee at issue worked at the former employer *for 16 years* before leaving. *Id.* at 843. Undoubtedly, during that extended period of time, the employee had strengthened—on his then-employer's dime—the customer relations he brought with him, thereby providing that former employer a cognizable interest. But Gibson's brief two-and-a-half-year stint at Cretor, appended to a prior twenty-plus years in the business, gives rise to no similar presumption of strengthened relationships. To the contrary, the evidence showed that Gibson had already-strong relationships with his customers when he went to Cretor. Again, the strength of those relationships was the very reason that Cretor hired him—precisely because it thought his customers would follow him. Against that backdrop, Cretor points to no evidence supporting any argument that Gibson strengthened those relationships in a meaningful way while at Cretor. So *Emerson* is of no help. The fifth and eighth *Raimonde* factors therefore both weigh in Gibson's favor.

Factors six (comparing the benefit to the employer with the harm to the employee) and seven (whether the restricted conduct is the employee's sole means of support) also favor Gibson. The Court heard testimony about how pumping concrete

is the only thing Gibson knows how to do. And it heard testimony about how pumping concrete in the Nashville market, where Gibson has contacts and a good professional reputation, allows him to earn about $138,000 per year despite having not finished high school. (Def.'s Ex. 12). Gibson testified that leaving that geographic area to pump concrete elsewhere would be tantamount to "starting all over." That is because a large part of what makes Gibson valuable in the Nashville market is his pre-existing customer relationships. Both Glen and Gibson testified that concrete pumping is a relationship business. So the Court finds that enforcing the noncompete covenant, which by its plain text bars Gibson from pumping concrete in the Nashville area, would substantially harm Gibson (which is part of factor six) by eliminating his sole means of support (factor seven).

Of course, the sixth factor requires the Court not only to consider the harm that Gibson would suffer from enforcement (identified above) but also the harm that Cretor would suffer without enforcement. But that does not help Cretor much. As discussed above, Cretor has shown precious little in terms of a legitimate protectable interest that the Court can weigh against the serious harm that Gibson would suffer from enforcement. And, unlike the harm to Gibson, Cretor has not shown that the harm it will suffer from non-enforcement is akin to "starting all over." Indeed, Cretor offered no evidence regarding the percentage of revenues that Gibson drives at the company, or the percentage of revenues that Cretor believes it will lose, or anything of the sort.

During the hearing, Cretor responded to the concerns about harm to Gibson, and the impact that such harm may have on enforceability under Ohio law, by arguing that it is not Cretor's burden to show that Gibson could make a comparable salary if the Court enjoined him from competing. And in fairness to Cretor, the Court agrees that Ohio law does not require a former employer to show that the defendant-employee will be able to obtain an identical salary in some other job if the Court enforces a noncompete covenant. But Cretor's suggested alternative here was that Gibson start pumping concrete in Huntsville, Alabama (a metropolitan area relatively close to Nashville). And Cretor put forth no evidence that pumping concrete in Huntsville—a market where Gibson has no professional contacts or reputation—would provide Gibson with even a *remotely* comparable salary. In fact, all the other evidence in the preliminary injunction hearing about the importance of relationships in the concrete pumping industry suggests that it would not. So Cretor's rebuttal is not persuasive. *Murfin, Inc. v. Kyle*, No. 79AP-602, 1980 WL 353359, at *6 (Ohio Ct. App. Mar. 25, 1980) ("[T]here was no indication that defendant would be able to gain employment with any other company in this geographic area in a comparable position and a comparable salary[.] … [There is] no indication of the availability of other suitable employment … . Accordingly, [the plaintiff's arguments] … are not well taken."). Both the sixth and seventh *Raimonde* factors therefore favor Gibson.

That leaves the fourth *Raimonde* factor: whether the noncompete agreement encourages ordinary or unfair competition. Basically, this factor asks whether the former employer has either provided some benefit to the former employee or

22

disadvantaged itself in some way in reliance on the noncompete, such that it would be unfair to allow the former employee or his new employer to take advantage of the benefits the former employer provided (or detriments that the former employer incurred) to compete against that former employer. The evidence presented at the preliminary injunction hearing showed little in Cretor's favor on this factor.

To start, it seemed clear that Gibson brought his long-time customers from Premier/Reynolds to Cretor, and that Cretor's principal concern is that Gibson will now take his pre-existing book of business elsewhere—not that he will poach other customers to which he was introduced at Cretor. The Court struggles to credit that concern as a protectable interest. *Arthur J. Gallagher*, 2016 WL 4523104, at *11 ("[W]hen the firm has little or no effect on bringing the customer to the firm, we find little protectable interest. … [There is more likely to be] a protectable interest when … the customer came to the employer … [than] when customers follow the employee, especially to a new employer …"). To be sure, it might be a different case if Cretor had "purchased" the customer goodwill from Gibson up front. For example, had Cretor paid a large bonus for the customer base up front, in hopes of amortizing that payment over the many years during which Gibson would work at Cretor (or would be on the sidelines if he left), that could change the Court's analysis of this factor. But there was no such evidence here. True, in the LTI, Cretor promised to pay a discretionary bonus to Gibson, which it contends was on the order of $2,000–$3,000 per year. And while Gibson tentatively disputes that he received any such bonus, the Court is willing to credit Cretor's testimony that the company paid it. But that

payment was not for accumulated goodwill. Rather, it looked to be based on the services that Gibson provided *while at Cretor*. So any bonus paid pursuant to the LTI does not suffice to show that Cretor "bought" Gibson's customer relationships through the LTI, such that it may have an enforceable interest now.

Likewise, as already noted, Cretor did not put forth any evidence that Gibson possesses confidential information that belongs to Cretor that he can now use to its detriment, or that he has been soliciting Cretor customers since he left the company. *Compare Century Bus. Servs., Inc. v. Urban*, 900 N.E.2d 1048, 1059 (Ohio Ct. App. 2008) ("The evidence shows that Urban desired to and planned to (before receiving the letter from CBIZ's attorney) contact his CBIZ clients and entice them to leave CBIZ. This amounts to unfair competition, which is exactly what CBIZ was trying to prevent through the restrictive covenants.") *with MetroHealth Sys. v. Khandelwal*, 183 N.E.3d 590, 597 (Ohio Ct. App. 2022) ("Khandelwal testified that he did not intend to utilize MetroHealth's referral sources at Akron Children's. … It was not … unreasonable … for the trial court to conclude that the noncompete agreement as written, with its two-year, 35-mile restriction on the practice of medicine, went beyond protecting MetroHealth against unfair competition.").

Nor did Cretor provide evidence that it had somehow burdened itself in reliance on the noncompete, such as by somehow investing in Gibson, so that it would now be unfair to allow Gibson to take advantage of that investment through his new employer. The only evidence that Cretor invested in Gibson was Glen's testimony that Cretor (1) bought a pump that cost more than one million dollars to assist in

24

performing the concrete-pumping jobs that it thought Gibson's customers would purchase and (2) hired a team of six to seven workers. If Cretor took those actions in reliance on the noncompete covenant, and if they represented a substantial burden to Cretor, which is now stuck with what is essentially a stranded capital outlay (i.e., the pump), which in turn makes it less competitive in the market, the Court could perhaps understand the argument. But there are at least two problems with it here. First, there was no testimony that Cretor bought the pump *in reliance on* the noncompete. True, the testimony showed that Cretor bought it because Gibson was coming on board. But nothing in the evidence tied the pump purchase decision to whether Gibson signed a noncompete. Separately, and perhaps more importantly, the evidence failed to show whether that capital outlay represents a major burden for Cretor or will work an ongoing harm to it. For example, Cretor did not present evidence about the number of pumps it has, its typical capital outlays each year, whether the new pump will still be useful for Cretor if the customers Gibson brought with him to Cretor ultimately follow him to Ram, or what the resale prospects for the pump would be if Cretor could no longer use it. And the workers, of course, do not represent a stranded capital cost. For starters, it sounds like at least some of them already have left for other jobs (some with Gibson). And, in any event, if Cretor lacks sufficient work to keep them employed, presumably they will move to concrete-pumping competitors who have more work.

The lack of any evidence suggesting a substantial non-recoverable investment in Gibson distinguishes this case from cases in which the employer relies on such an

investment as the basis for enforcement. *E.g.*, *Total Quality Logistics*, 220 N.E. 3d at 233 ("Leonard, who had no prior experience in the logistics industry, was hired by TQL in February 2018, received 22 weeks of extensive training to become a successful freight broker, was promoted during her employment with TQL … and began working for Ally, a TQL competitor[.]"); *Naegele v. Biomedical Sys. Corp.*, 272 S.W.3d 385, 389 (Mo. Ct. App. 2008) ("The evidence in the record showed that Biomedical invested considerable money, time, and effort to allow Naegele to develop, maintain, foster and preserve Biomedical's relationships with its customers[.]"). Unlike those cases, the competitive activity Cretor wishes to restrain appears to be ordinary competition, not unfair competition. So the fourth *Raimonde* factor also weighs in Gibson's favor.

In short, six of the nine *Raimonde* factors favor Gibson. Of course, the Court acknowledges that the analysis is not merely a matter of toting up how many factors point one way compared with how many point the other. Rather, as noted at the outset, the underlying question that the *Raimonde* factors are trying to answer is basically whether the noncompete at issue promotes consumer welfare or detracts from it. But that consideration likewise favors nonenforcement here.

As a general matter, competition among suppliers favors consumers, and free movement of employees generally leads to greater competition among suppliers— hence Ohio law's general disfavor for enforcing restrictive covenants. *See, e.g., Poll*, 594 N.E.3d at 1031 (noting that historically "agreements not to compete were viewed as restraints of trade and, therefore, were held invalid at common law on the ground

26

of public policy"). Indeed, the Federal Trade Commission raised much the same concern in promulgating a new, published-but-not-yet-effective rule banning such provisions in many employment settings.[5] Non-Compete Clause Rule, 89 Fed. Reg. 38,342, 38,430 (May 7, 2024) (effective Sept. 4, 2024) (to be codified at 40 C.F.R. pts. 910, 912); Non-Compete Clause Rule,, 88 Fed. Reg. 3482, 3495 (proposed Jan. 19, 2023) ("The first basis on which a non-compete clause can be found unreasonable is where the restraint is greater than needed to protect the employer's legitimate interest. … Courts do not recognize protection from ordinary competition as a legitimate business interest.").

But against that backdrop, the common law acknowledges that situations can arise where enforcement promotes consumer interests. For example, imagine that an employer can provide training to an employee that makes that employee better at providing a certain service. That investment in training benefits consumers, who receive better services. But the employer may not invest in such training if it is worried that the employee will leave and use those new skills for a competitor. As a result, a form of collective action problem can arise. Each competitor may wait for the other to invest in the training, believing it is cheaper just to hire the already-trained worker, rather than to incur the cost of training. Enforcing a noncompete in that setting incentivizes employers to invest in training. The employee's enhanced value (now that he is trained) is accessible only to the employer who provided it. Of course,

---

[5] The Court stresses that it is not relying on this not-yet-effective rule as a basis for nonenforcement here. The rule is merely further evidence of potential anticompetitive concerns that can arise as a result of such provisions, and thus provides further evidence as to why Ohio law may rightly be leery about enforcing them.

the employee remains free to leave, but not free to work for a competitor. And viewed that way, enforcement helps overcome the collective action problem that would otherwise take hold, meaning more training, in turn leading to consumer benefits.

The same can be true for confidential information. Imagine a person who has built a better mousetrap using confidential techniques. The world is now beating a path to her door, but she can build mousetraps only so fast. If she hires employees, she can scale production. But she would be reluctant to do so, if revealing the confidential information meant the employees were free to leave and to compete against her by using it. In that context, an enforceable noncompete would allow for scaling, thereby benefiting the additional consumers who will now have access to the improved device.

One can tell a similar story about customer relationships. Imagine a small vendor who provides a service to a company. The company likes the service that the person provides and would like that vendor to expand their offerings by hiring more personnel who could provide that same service. The vendor may hesitate to do so, though, concerned that each new employee it exposes to the client company could build his or her own relationship with the customer, then leave to compete. From the vendor's perspective, hiring new employees is like inviting the fox into the henhouse. There, enforcing a noncompete provision would mitigate the vendor's risk, thereby making the vendor more likely to expand its business, in turn redounding to the benefit of the vendor's customers.

Or one could imagine that in connection with selling a business, the purchaser is willing to pay the seller for accumulated customer goodwill. But it will do so only if the business seller can promise in an enforceable manner that he will not reenter the market (and thereby recapture his now-sold goodwill). Enforcing noncompetes in that setting allows the seller to benefit from the goodwill that he created. And while that is not directly pro-consumer, as the payment is just a benefit the seller accrues at the time of sale, the long-run incentives it creates can be. If sellers know they can monetize accumulated goodwill on exit, they have additional incentives to build such goodwill in the first place, which benefits their customers in the form of better service.

Here, though, Cretor has pointed to no allegedly pro-consumer benefit that would arise from enforcement of its noncompete. As the examples above illustrate, those benefits usually arise from some investment decision on the employer's part that reliance on the noncompete provision has allowed it to make (e.g., investment in training, exposing the employee to clients, paying for goodwill, etc.). But nothing of the sort appears to be at issue here. Rather, at its core, the LTI seems to include what could be characterized as a bare noncompete—a noncompetition provision in which the employer simply tries to insulate itself from competition, without making any offsetting pro-consumer investment. And the potential for harm to customers arising from such arrangements is obvious. Those customers who have a long-standing relationship with Gibson, not developed on Cretor's dime, and who prefer working with Gibson, will be forced instead to accept (from their perspective) a second-best

29

substitute. If there were an offsetting pro-competitive benefit, perhaps Ohio law would enforce the provision. But Cretor has identified none.

When the Court raised this concern about enforcing a bare noncompete to prevent access to pre-existing customer relationships at the hearing, Cretor responded with one case: *Willis Ohio Inc. v. Turney*. No. 11-cv-15804, 2014 Ohio Misc. LEXIS 3935 (Ohio Ct. Com. Pl. May 9, 2014). At the hearing, Cretor argued that the court in *Turney* enforced a noncompete as to pre-existing customer relations in a very similar setting. But further investigation shows that the case differs from this one in an important way—there the party asserting the customer relationships as a basis for enforcing a restrictive covenant actually had actually *purchased* the customer goodwill at issue, giving it a legitimate protectable interest. To explain that a bit further, the defendant employee in *Turney* was an insurance agent who had developed client relationships at one insurance company that was then acquired by a second insurance company. *Id.* at *11. Turney (the employee) thereafter left the second insurer, after receiving a hefty severance package on the way out the door in exchange for signing restrictive covenants. *Id.* at *2. When he joined a third insurance company and began to compete, the second insurer sued. *Id.* In that suit, the third insurer claimed that the second insurer should not be able to rely on Turney's customer relationships as a basis for enforcement, as he had actually developed them at the first insurance company, and thus the second insurer did not have a protectable interest (a version of the argument that Gibson makes here). *Id.* at *10. As Cretor suggests, the *Turney* court rejected that argument, but it did so because the second

insurer had acquired the first insurer by way of merger (thus presumably paying, as part of the acquisition price, for the accumulated goodwill associated with those customer relationships). *Id*. at *11. So there, the party relying on the customer relationships as the basis for enforcement (the second insurer) had in fact paid for them—the customer relationships in a sense had been built on (or at least been bought with) the purchaser's dime. And, in that setting, as noted above, pro-consumer reasons for enforcement exist.

Here, by contrast, Gibson developed the vast majority of his client relationships well before joining Cretor. Moreover, as the Court specifically confirmed during the preliminary injunction hearing, Cretor did not purchase Gibson's goodwill with his previous clients, either from Gibson or Gibson's former employer. So *Turney* does not persuade the Court that Cretor has shown a strong likelihood of success on the merits. Beyond that, in Cretor's follow-up email to the Court, Cretor confirmed that it has been unable to locate any Ohio case that has found what it called a "legitimate, protectable interest in a departing employee's pre-existing customer relationship." True, counsel pointed to *Emerson* (discussed above) as out-of-circuit persuasive authority on that front. But for the reasons already discussed, that case does not help Cretor here.

In sum, so far as the Court can tell, Ohio law has, to date, not enforced what this Court described above as a bare noncompete provision. This Court is not inclined to be the first to do so. Perhaps as to the "few" new customers Gibson met at Cretor the situation is a bit different. But even as to them, for the reasons discussed above,

there is simply not sufficient evidence to conclude that Cretor is likely to meet the heavy burden of showing by clear and convincing evidence each of the three factors necessary for enforcing a noncompete provision under Ohio law.[6] *See Chi. Title Ins. Corp.*, 487 F.3d at 991. Accordingly, as things stand, the Court concludes that Cretor has not demonstrated a substantial likelihood of success on the merits. That said, the Court acknowledges that, given the clarity of the provision and the limited geographic scope as to which Cretor seeks enforcement, Cretor has done enough, at least with regard to the noncompete covenant (the one preventing Gibson from even accepting employment at a competitor) to avoid application of the rule that failure to demonstrate any meaningful likelihood of success can be, in and of itself, fatal to the request for a preliminary injunction. *Gonzales*, 225 F.3d at 625. So, while this factor of the four-factor preliminary injunction test counts against Cretor, the Court will still go on to balance this factor against the three remaining factors.[7]

## B.    Irreparable Injury

Cretor fares better on the second element—irreparable harm. To succeed on this element, the party seeking the injunction must show (1) a "harm … [that] is not

---

[6] That said, the Court acknowledges that, with a limited additional factual showing, those new customers could provide the basis for enforcement of, at the very least, a more tailored restrictive covenant designed to prevent Gibson from exploiting those new customer relationships to benefit Ram.

[7] The same cannot be said as to the narrower non-solicitation and non-disclosure covenants, on which Cretor also relies. The vast majority of the discussion as to the likelihood of success prong related to the noncompete provision, rather than these other restrictive covenants. That is because there was no evidence that Gibson had violated those narrower covenants. Thus, as to the narrower covenants, the Court concludes that the evidentiary showing was so defective that the above-described rule from *Gonzales* means that Cretor's failure on the first prong is fatal as to those other covenants.

fully compensable by monetary damages" or (2) "a violation of [its] constitutional rights." *Overstreet*, 305 F.3d at 578. The alleged "injury must be both certain and immediate, not speculative or theoretical." *Memphis A. Phillip Randolph Inst.*, 478 F. Supp. 3d at 704. And, of course, as "this action [is] between private parties [and thus] does not involve any constitutional claims, the irreparable-injury question reduces to whether Plaintiff[] ha[s] shown [it] will suffer, without Court intervention, some other kind of harms that are not fully compensable by money damages." *Int'l Union of Painters & Allied Trades Dist. Council No. 6. v. Smith*, No. 1:23-cv-502, 2024 WL 1012967, at *8 (S.D. Ohio Mar. 8, 2024).

"[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). In other words, this element asks whether, if the Court were to be wrong in denying injunctive relief, money damages (paid after judgment) would suffice to compensate the plaintiff for harm incurred during the litigation. And on that front, settled law holds that the "loss of customer goodwill … resulting from breach of a restrictive covenant constitutes irreparable harm" that is not compensable through money damages. *Hall*, 878 F.3d at 530. Accordingly, Cretor has met its burden as to the second prong of the preliminary injunction standard.

## C.    Equitable Balancing of Harms

The third prong, which calls for equitable balancing of harms, favors Gibson. "In considering this factor, the Court must (1) balance the harm Plaintiff would suffer

if its request for a preliminary injunction were denied against the harm Defendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Procter & Gamble Co. v. Ga.-Pac. Consumer Prods. LP*, No. 1:09-cv-318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009). The latter consideration applies only to specifically known, relevant third parties, as the Court considers harms to the general public under the fourth prong, *see infra* Part D. *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) ("Our next factor to consider in assessing whether an injunction should be granted is whether it will cause harm to others—in this instance to [the defendant], for the 'others' in more generic terms, the consuming public, are dealt with in the next section of this opinion."). As neither party developed arguments about harms to specifically identified third parties, the Court considers only possible harms to the parties themselves.

As already noted in connection with the discussion of *Raimonde* factors six and seven, *see supra* Part A, at first glance, the harms to Gibson and Cretor seem symmetrical. After all, any customer leaving Cretor to follow Gibson to Ram seems equally to burden Cretor and to benefit Gibson (or at least Ram). But that apparent symmetry masks a key difference.

Enforcing the noncompetition provision leaves Gibson with no apparent means to support himself or his family. Even if he were to move to a new location, he would be, in his own words, "starting all over." Gibson's reputation (and corresponding ability to attract customers, which is what creates a large part of his value as an

34

employee) is local to Nashville. The requested preliminary injunction would entirely deprive him of the benefit of his reputation and contacts. That functionally puts him out of business. The price for Gibson, if the Court improperly enforces the noncompetition provision, is therefore steep.

Cretor, by contrast, offered no evidence about how much of its work, whether in dollars or as a percentage of its overall revenue, it stands to lose because of Gibson's departure. And certainly nothing in the current record suggests that Cretor would lose its entire business due to Gibson's departure—again, in contrast to Gibson, who it appears would lose his entire livelihood if the Court entered a preliminary injunction. Thus, on the current record, the balance of harms favors Gibson. *Compare Builder Servs. Grp., Inc. v. Pick*, No. 3:09-cv-255, 2009 WL 10715644, at *3 (M.D. Pa. Feb. 12, 2009) ("[R]elief … will effectively put the defendant corporation out of business … . This loss is much more tangible and quantifiable than the plaintiff's claim of loss of profits or customers … . The balance of the equities therefore[] weighs heavily in favor of the defendants."), *with Seaman Corp. v. Flaherty*, No. 5:20-cv-443, 2020 WL 5223614, at *10 (N.D. Ohio Aug. 3, 2020) ("The harms to Flaherty simply do not outweigh the harms Seaman faces. Seaman faces continued breach of contract, risk of misappropriation of its confidential business data and trade secrets, and the probability of Siplast acquiring an unfairly achieved competitive advantage. Flaherty's demonstrable ability to work as a salesman in a non-competitive field mitigates against any harm [to him] …").

35

**D.    The Public Interest**

The final element of the analysis is the harm to the public occasioned by wrongly entering or (failing to enter) a preliminary injunction. Here, this prong also counsels against granting the preliminary injunction—for many of the same reasons already noted above in the discussion of *Raimonde* and the enforceability of noncompetes under Ohio law generally. At the risk of undue repetition, competition generally benefits consumers. They get lower prices and better service options by virtue of multiple suppliers' competing for their business. *See, e.g.*, *Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of R.I.*, 692 F. Supp. 52, 70 (D.R.I. 1988) ("Offering HealthMate as an option to subscribers who are eligible for Ocean State, is head[-]to[-]head competition between Ocean State and Blue Cross and that competition benefits consumers by providing them with alternative health care financing options."). If the Court were to grant the requested injunction, only to determine at a later date that it erred in doing so, the public would lose some of the benefits of that competition. Or, to put it terms more directly relevant here, it appears that at least some customers for concrete-pumping services in the Nashville area prefer to work with Gibson, independent of the company for which he is working. The requested preliminary injunction forces those customers to hire a less-preferred alternative.

By contrast, if the Court denies the request for injunctive relief, only to later determine that it erred in doing so, the public would not suffer any meaningful harm. To be sure, there is a general public interest in enforcing contracts, including noncompete covenants. *Mercy Health Servs. Inc. v. Efstratiadis*, 579 F. Supp. 3d 1096,

1117 (N.D. Iowa 2022) ("The Court finds that public interest is served in the enforcement of valid contracts and noncompete clauses …"). But beyond that largely notional harm (stated at a high level of generality), the customers for concrete-pumping services in Nashville (members of the public directly implicated by the Court's decision and therefore the ones who truly experience concretely the results of today's decision) will not suffer in the interim. *See Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002) ("[W]hile the public generally may have an interest in seeing that reasonable non-compete covenants are enforced, the court determined in this instance that the public interest would best be served by allowing a successful salesman to continue performing his trade.").

True, had Cretor shown that failure to enforce the noncompete might lead to its demise, things could be different. If that were the case, erroneous failure to enter the requested injunctive relief could cause customers who prefer Cretor to be deprived of *their* choice for concrete-pumping services (say, if Cretor were to go out of business or to exit the Nashville market). But as the Court already noted immediately above when discussing the third prong, *see supra* Part C, Cretor, which bears the burden of proof in demonstrating its entitlement to this extraordinary equitable relief, has offered no such evidence here. So on the current record, the fourth factor also favors Gibson.

\*        \*        \*

In short, the Court finds that only one of the four factors it must consider supports granting a preliminary injunction here. Accordingly, taking the four factors

as a group, and particularly in light of Cretor's inability to identify any pro-competitive effect from enforcing the type of noncompete at issue here, the Court concludes that preliminary injunctive relief is not warranted. Thus, the Court will deny Cretor's request for that relief.

## CONCLUSION

For the above reasons, the Court **DENIES** Cretor's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 4) as follows: (1) as moot to the extent that the Motion seeks a temporary restraining order; and (2) on the merits to the extent that the Motion seeks a preliminary injunction.

**SO ORDERED.**

July 1, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**